My name is Michael Abelson, and I represent the appellants in this appeal, PAN PACIFIC Retail Properties and Western Properties Trust. At issue here is the appellant's challenge to the district court's order. Specifically, the appellants had sought $1.6 million in defense costs and an additional $975,000 in settlement, which arose out of an underlying securities action that had been filed when PAN PACIFIC sought to merge with Western Properties. The underlying securities action contained ten different causes of action, and over the course of an 18-month period of time, all of the causes of action or claims had been thrown out by way of summary judgment, with the exception of one type of claim, those having to do with breach of the fiduciary duty of disclosure. Ultimately, when it was found that the appellants, the insureds here, were not going to get any relief or aid from their insurers, they settled the underlying case, and then they sued the insurers to get coverage for the securities action. The district court held that there was no coverage in the subsequent securities case under two separate policies of insurance. Gulf Insurance insured PAN PACIFIC, and Twin  Now, you know the facts, and your time is short. Do you want to cut to the chase and start addressing the legal issues? Absolutely. Your Honor, there are three issues. One, I'd like to talk about the obligation to reimburse defense costs in this case. Two, I'd like to talk about the specific claim that remained at the end of the securities case, that being the breach of fiduciary duty claim and why it was not restitutionary. And third, I want to take up the issue of the separate defense that Twin City has, that there was no loss here, and therefore, they have no insuring obligations. As you discuss these questions, you're going to be discussing them under what law? Well, California law, with respect to the application of the contracts, the two insurance contracts, Delaware law in particular bears on how the nature of the remedy is characterized with respect to the restitution claim. Go right ahead. I just want to make sure we're on the same page on that. Well, the key documents here, of course, are going to be the two contracts, that being the Gulf policy and the Twin City policy. And there are really three key provisions in the — in those insurance policies. They're interrelated provisions that have to do with when the insurer has an obligation to actually make a payment, be it by way of defense or indemnity. And those three interrelated concepts are loss, claim, and wrongful act. In particular, the insurer is required to make a payment for a loss as a result of a claim for a wrongful act. That's what the insuring clause says, and that's what the insured is required to show in order to prove up an entitlement to coverage. Each of those terms is separately defined in each of the policies. A claim has a lot of different forms, but here it was a lawsuit, the underlying securities lawsuit, and I don't think we disagree with anyone that there was a claim here. I also don't think there's any disagreement that there was a wrongful act here, because the policy defines a wrongful act as an actual or an alleged error, omission, misstatement, or breach of duty. And we had 10 of those, actually, in the underlying securities case, everything ranging from breaches of fiduciary duty to claims for fraud and unjust enrichment. So the case comes down to whether we suffered a loss, and that term is also defined in the policy, having to do with the amount that an insured pays as a result of the wrongful acts. And there were two payments that were made here. We paid $1.6 million, actually it was in two components. Each of the insureds paid approximately $800,000 to their attorneys to defend the underlying case, and then ultimately they made a settlement payment of $975,000. That was the loss. There was a defense component and there was an indemnity component. The policy defines loss as including and excluding different types of things, and it's all subject to a big limitation. And the big limitation is, and the one that we're probably going to be spending most of the time on today, is a provision in both policies that says, look, we're not responsible for a loss to the extent the matter is uninsurable under the law of, in this case, California. And I want to be very clear about something. We are not arguing in this brief or in this appeal that restitution is somehow insurable in California. It isn't. We agree. The argument here, quite simply, is that if you take the time to work through the actual claims and defenses in this case, you see that this was not a restitutionary remedy that was being sought. For example … What was it a remedy for? I realize there were other claims, but what claim that was existing at the time of the settlement or that had been, maybe that had even been discussed but was still arguable, is represented in the settlement? Yeah. Actually, it comes down to one type of claim. It's the breach of fiduciary duty of disclosure claim. The Alameda County Superior Court had dismissed all other types of claims that had been pled. There were different aspects of those ten claims, and at the end of the day, they all came down to the Superior Court saying, look, all those claims are out. The only thing that you're going to go to trial on is the claim for breach of fiduciary duty of disclosure. And ultimately, that was the one type of claim that was settled at the end of the case. Now could the district court make a judgment that the settlement amount doesn't appear to be damages for breach of duty to disclose, but rather looks like more compensation, you know, for the acquisition? Or is that impermissible? Well, that's exactly what the district court did, Your Honor. It looked through, relying on the Seventh Circuit Level III opinion. It said, I have the ability to look through this claim and see that it looks restitutionary to me. And we simply submit that that's an impermissible – based on the record, that was an impermissible conclusion that the court, in fact, erred. And there was plenty of indicia that the district court could have used to indicate that it wasn't a restitutionary type of relief that was being sought at the end of the day. The reasons being, number one, Delaware law – this was, again, an unadjudicated claim – Delaware law does allow for compensatory damages on a breach of fiduciary duty type of claim. So for the district court to decide unilaterally that it was restitutionary relief foreclosed a possible type of recovery that could have been sought and insured in the underlying case. But there were also refinements that the claim had gone through. This had a very long history, this claim. It had gone through a class certification process. It had gone through motions for summary judgment. And if you read the underlying orders from the superior court, you can see one of the things that they did is they threw out, for example, the claim for unjust enrichment, which would have been disgorgement, and we would have agreed was restitutionary type relief. That claim was gone at the time the case was settled. The other thing the – that the superior court had done is it divided the case and the claim out in two. It said, look, we're going to allow to go to trial that aspect of the claim that deals with direct damages, and we are dismissing that part of the claim that has to do with derivative damages. If this was truly a restitutionary type claim, or what we're going to hear from the insurers in a moment, what they say was a bump-up claim or additional consideration paid for the – for the transaction that took place, that would have been a derivative type of relief, and that, as I say, was dismissed from the case. The only thing left were direct damages. What was going to go to trial was, in fact, damages that had impaired the voting rights of the individual plaintiffs, and that's what they were going to have to show below. What was the wrongful conduct alleged, I mean, for this breach of fiduciary duty claim? What – what – That basically that – that there had not been either adequate disclosures or the disclosures were misleading in terms of various aspects inducing the shareholders to vote for the merger, that the – the proxy statement, in fact, was just misleading. And either didn't say things or did not say completely things, but ineffective disclosure at the end of the day. Well, you know, here's the problem. If you – if you have a claim against directors on that basis, and, you know, the – the – the full claim is that they cooked up the scheme to line their own pockets and fool the shareholders and fool, you know, commit some sort of fraud, that's sort of the whole gestalt. You can also sort of break it down, exactly the same conduct, and say, well, part of that is making misleading statements or giving inadequate disclosures. It's exactly the same behavior, but now you have left out the lining their own pockets part, you've – you've left out the fiduciary duty part, and you say, well, even if you didn't have fiduciary – I mean, as you know, you practice in California, yes? Yes, that's correct. Yeah, I mean, I'm sure it's true in other states as well, but complaints in California counts, and when you finally sort of get down to the nerve, there's really no – the core of operative fact that's being alleged wrongful is – winds up being fairly narrow in relation to all the words, all the toner that's spilled in expressing it, but, you know, you've got your – your fiduciary duty count, there's – there's your covenant of good faith and fair dealing count, I mean, it goes on and on and on and on. So I don't quite know how we deal with this in a situation where the very same conduct, the very same thing being alleged can be stated as a fraud intended to line the pockets of the – of the – of the officers and directors, and also quite properly and without any – any – any artifice can also be pledged as simply an inadequate disclosure. Let me answer that. I think you can do two things here. Number one, you can give me my defense costs, because I think that's pretty clear under the policy that the definition of loss includes – it says this in both policies – includes defense costs, and those are the reasonable and necessary costs in order to defend the claim. Those are not restitutionary. Those are paid to the lawyers, and though the clients may say that's ill-gotten money, the fact of the matter is it's not a return of some type of improper benefit that's been obtained by – by the – by the company or by the directors. And the second thing that you can do is that you can actually allow the claim to be adjudicated. Although in this case it's been settled, you take testimony from the attorneys in the case as to what was being still in controversy at the time the claim would have been postured up for trial. On the record here, we have that. I think rather extraordinary, we have two declarations. We have one declaration from Mr. James, who actually handled the underlying case on behalf of the officers and directors and defended the case. But really, the more extraordinary declaration, and for the Court's attention, it's at 832 of the record. We have the declaration of the plaintiff's attorney in this case, the guy who was pressing these claims, and he says, look, when I lost everything in the underlying case on that motion for summary judgment except for the breach of fiduciary duty claim – and I'm paraphrasing – but he says, I knew the game was up. I had lost the ability to get the type of damages that I was really after in this case, that being the bump-up, the additional consideration, the restitutionary type of relief. And so at the end of the day, I cut the best deal that I could and I settled. I think that's a very fair reading of what Mr. Rotana says, James – excuse me, Robert Rotana. So to answer your question –  832 is the beginning of the declaration. And he talks about how he interpreted what the Alameda Superior Court did to him or did to the claims and what he felt was left and why he settled the underlying case. Would it be possible in every case where there's a misappropriation of property of some kind that might be subject to restitution in every financial case to also characterize it as a nondisclosure case and thereby gain coverage on all those cases for the amount of a judgment or a settlement? And if that's so, how do we view the California uninsurability law, if that's correct? Well, I'll be very candid with you. I don't know enough about pleading the securities claim as to how that would shake out. But at the end of the day, the insurer is entitled to look at, for indemnity purposes, the claim that was adjudicated and what it was paid out for. And presumably, either a trial or a summary judgment in order would say breach of fiduciary duty and the remedy here, for example, is the incremental difference in the stock price. That would come out as restitutionary and it would be produced. And if there was a settlement, if there was a settlement, I suppose you could have cases where there's a trial and findings about what was settled. Was there any But here, was there any evidentiary hearing in the district court on that issue, or is it all on the paper? It's all on the papers. And the two declarations, Mr. James' at 1355 for the defense and Mr. Ratana at 832, were put in. Those were the only people who had dealt with the underlying case. That was the only evidence. They weren't interviewed. They weren't deposed. There was no evidentiary hearing. And our position is that that information was uncontradicted in the record, and therefore, the district court was obligated to accept it. I'm out of time, Your Honor. Tell me again. I just found that declaration. What specific language on it or paragraph or whatever you rely on? You don't have to read it. You just tell me what it is. Just quickly, I have one highlighted here at 832. He says it, paragraph 4, I think is the critical paragraph. Okay. The entire paragraph 4? Correct. Okay. We'll take a look at it. Thank you, Your Honor. Okay. We'll hear from opposing counsel. Good morning, Your Honors. David DiBiase with my colleague David Billings on behalf of Gulf to split 15 minutes with Mr. Sutro, who is here on behalf of Twin City. I submit to this Court that if the ruling of the trial court is to be undone, that a natural ancillary to that is that if my client and Mr. Sutro's client are to, in effect, fund the additional consideration to close this merger, then give us an equity interest in the surviving company. Insurance is not about financing mergers, and I submit respectfully that the trial court did what it is obligated to do. What Level 3 for the case is obligated to do, which is to look beyond labels and to grasp the substance of what the underlying lawsuit was about. And when Judge Burns below did so, at page 175 of this record, and in his ruling. Are you talking about Judge Burns? Yes. You got it wrong in your brief, too. Oh, I'm sorry, Judge Hayes. I misspoke. Judge Hayes, Judge Burns was the magistrate judge. When Judge Hayes at page 175 of this record, page 12 of his ruling, looked to the critical allegations of the underlying complaint, which repeatedly stated that the shareholders of Western were underpaid. They received less than fair value for their shares in the merger transaction. He cites just four of the many examples there. That what we really have here is a case with all the multiple causes of action. One way or the other seeks one thing and one thing only. And what it seeks is more money for the shareholders whose interests were bought out in the Pan Pacific merger. I submit that level three and Bank of the West are on point. That is nothing short. What do you do in a situation where the claim really is the information given to the shareholders was inadequate? And had there been adequate disclosures there, shareholders would not have voted to approve the merger and perhaps held off for more money or held off for a better merger or been better off financially by simply turning it down. Is that a restitutionary? It is in the ultimate sense because we all know as a practical matter, mergers of this nature cannot be undone. You can't put the genie back in the bottle. So whether you phrase your complaint as a matter of direct overt undercompensation to the acquired shareholders or you try to get to the same point by alleging some sort of breach of fiduciary duty, which I'd like to address as a sidebar matter, the ultimate result is the same. And the ultimate result manifested itself in this very case with a practical conclusion, which is everyone got more money on a per share basis. That's an easy thing for you to say. It would be a very nice thing for the insurance company to have a rule like that. But let's say you are a director. Let's say you are an outside director of a company and business people come to you and say, look, we've got a chance to do this merger. We're being heartily pursued by this other company. We think this would be very good for our shareholders. We think it would be very good. There would be added value to that. And so you get a pile of papers that lawyers and investment bankers have put together. You've seen what those things look like, yes? Back to the ceiling. They are complicated. And frankly, without one's own lawyer, I think it would be very difficult to be able to tell what a disclosure, and even with one's own lawyer at one side, one would have a very hard time making sure that there isn't some material omission or some material claim, or at least that somebody with an aggressive enough plaintiff's lawyer who's sort of hungry enough for a I'm going to use a pejorative term here, a hold up settlement. I'm not saying accusing anybody in particular of this, but we know things like that happen. So you are out there, the barracudas are circling, and you have to sign off on whether or not this merger goes forward. And you say, wow, how do I know? I mean, if I get sued, and they then claim that something in these my insurance company, Gulf Insurance Company, they're going to say, well, what's at the heart of this thing is a claim that you stole money from the company. And I don't understand how a position you have taken here so confidently would allow for a legitimate defense of a legitimate director who legitimately though perhaps mistakenly or perhaps correctly, but nevertheless having to defend a lawsuit, approves a normal merger. How do we get, or is that simply an uninsurable claim, and directors and officers have to go bareback when it comes to such claims? When an officer or director, of course, with the benefit of indemnity from the corporation, is individually sued and, of course, receives from the corporation indemnity, that's what directors and officers' indemnity insurance is about. You know that's an irrelevant fact. The company might be able to provide indemnity or not. We're talking about insurance here. Okay? And if you are, the reason you get insurance is you don't have to rely on indemnity. So throwing in the word indemnity is only a distraction. It doesn't fool me. It's not going to help you. So why don't you go ahead and answer the question? I won't prefer to try to fool you, Judge Kiskinski. Okay, so don't talk about indemnity. If indemnity solved the problem, we wouldn't, your clients would be out of business because nobody would buy insurance. Obviously, they don't think indemnity will take care of it. Right? The insurance provided does two things. Number one, it expressly says under the definition of loss, and I refer here to the record at page 166, that matters not within, matters not within the coverage, not included in the loss are, quote, matters that are not within the coverage. Okay, I got you. Uninsurable. I'm sorry. Could you, could you, I've got the policy here. Just so I'm on the same page with you. What page are you reading from? Well, I'm reading from the Court's opinion. It's at 166. I don't, would you like the, yes, I would like the, go ahead, read. But I don't understand why, if you're sitting here presenting the insurance company, you don't have the insurance contract with you. Well, I have the pertinent portion of it, but it's in a different part of the record. If you'd like the actual contract, I'll have it. Well, I don't care where you're reading from. You tell me where in the contract I can find the language you're reading. Yes. It's at 166, Your Honor, of the record. No, where in the policy. Okay. In the policy, in the policy definition of loss. Which is on page 1 of the policy. Page. I mean, I can. Section, section 2E, Roman 2E, which is, again, recited at length at page 166 of this record. That definition of loss is, of course. Sir, page 1 of the record? 166. Your numbers are, sir, like, oh, I'm sorry, this is the. That's from, that's Judge Hayes quoted in his memorandum decision. Go ahead. 166. Yes. Well, that's not the policy. That's an opinion. That is the text of the policy, the operative provision. It is important to try to respond. Go ahead. To try to respond to your question. You understand the difficulty of looking at partial quotes of a document. You can't see what comes before, what comes afterwards. Right. The reason I asked for the thing in context so I can see what the thing looks like. Of course. Counsel anxiously is approaching you. Page 58, Your Honor. I'm really surprised that, as a lawyer for an insurance company, you come here this morning not knowing exactly, having looked at this document, knowing exactly where it is. But go ahead. I stand admonished, Your Honor. Page 58 of the record, like page 166, the entirety of the definition of loss is set forth. And the point I was trying to make is that. I'm sorry. This is page what of the record? 58. Excuse me. Page 424 of the record. Okay. Page 424 of this record. Okay. And in the middle of page 424, 424 of this record. All right. Is the definition of loss. And the point I was ineptly attempting to make, Your Honor, is that the loss definition itself takes into account and incorporates, quote, matters uninsurable under the law pursuant to which this policy is construed. So the question that the Court presented, I can answer as follows. And the question is, what's a poor director to do going into complicated transactions where he may be sued for a variety of reasons? And my answer is that if the claim against the director and or his corporation for whom he is employed, with whom he is employed, is that they paid inadequate consideration for an acquired company, then it's on their dime. What if the claim is that the directors didn't give the shareholders adequate information that they should have disclosed, and a consequence of that was the shareholders got less money than they should have gotten? Well, this takes us. Is there California law that says that the nondisclosure claim is then uninsurable, or is that like an open matter that we would have to assess? Is that what Level 3 basically does? In other words, surely it's insurable that someone did not make disclosures if the damages were of a different nature. So if, for example, because of lack of proper disclosure, a shareholder later said, I had a heart attack or great emotional distress when I learned I'd been hoodwinked, you know, unless there's some other reason why that's not compensable under the policy, that wouldn't come under the no restitution rule. It might be barred by a different rule, but I'm not seeing why some nondisclosure claims wouldn't be coverable. You make a very good point, Judge Gould. In this case, the reference, if we travel from the Bank of the West decision of the California Supreme Court and go east and look at some Delaware law about the theoretical possibility of lack of information being a compensable component of damage as a generic concept, and there are cases that so state, but what we have here is that component of a claim which has to be looked at at the end of the day, and at the end of the day, like at the beginning of the day, in the underlying case, there was only one thing involved, and that is shareholders of Western who claimed they got shorted for the value of their stock, and at the end of the day, that shortfall was made good by way of a settlement, and that settlement should not, as a matter of public policy, be funded by the insurance industry. That settlement should be paid by the entity which got the benefit of acquiring the stock for less than its fair value, and the related burden in defending that, if I can transition it to defense costs, likewise, likewise is on the acquiring company, and when counsel for the appellant looked at the loss provision, of course, he neglected to mention that loss, including an attorney's fees, applies to covered claims. Again, Judge Kaczynski, record at 424, and so it seems to me that is this a sorry, sir, but the insurance policy does not respond as to the unique aspects of this case? The answer is yes, we do not, and without apology, we believe that American Business Enterprise, to the extent that they are accused of getting something for nothing, paying more for something than, excuse me, less for something than it was worth, when they are called to account for that, that is something that the business enterprise itself has to pay for, not the insurance industry. And I think that that is the connection between this case, public policy in general, and concepts of increased merger consideration, all brought into one, I think very effectively, by the trial court, where he said, I'm going to call a spade a spade, I'm going to look at the bottom line, and that's what he did, and that's what I encourage this court to do as well. Okay. Judge Kaczynski, we took counsel past his planned segment. I would like, even though the time was used up, to hear Twin Cities' independent argument. Okay. Thank you. Thank you, Judge Gould. May I hear your five minutes? Five minutes? Thank you. In that five minutes, I'd like to do two things. One, I'd like to focus quickly on Twin Cities' separate defense, and then I'd like to answer some of the specific questions that were asked about this record and what the plaintiffs were seeking in this case, because the factual determination was made accurately by the court that all that was sought by the plaintiffs in the underlying merger litigation was additional consideration. No alternative theory was ever posited, and none was ever adopted, even after the disclosure claims were the only ones that were made. But let me first focus on the issue of defense costs for Twin City. Twin City Fire Insurance Company is the insurer of Western and Western's directors and officers. It is not the insurer of Pan Pacific. That's important because Western was acquired by Pan Pacific in the merger, and pursuant to the merger agreement, Pan Pacific agreed to indemnify Western and its directors and officers. As a result, at the end of the day, when they came to us and they said, we would like you to reimburse defense costs that were paid on behalf of directors and officers, we asked who paid. Guess what? The answer was Pan Pacific. Now, this is a coverage case, so it's important that we look at the policy and what the insuring clauses in the policy require in order for there to be coverage. And in this case, for the DNO's defense costs to be indemnified, those defense costs have to be indemnified by Western. Western never indemnified their directors and officers. It's very simple. Western has the ability to sue us for coverage, but they must prove that there's coverage, and they cannot prove that there's coverage for the directors and officers' legal expenses because, at the end of the day, Western never indemnified the directors and officers. It's very simple. And for the same reasons, those definitely ---- I'm sorry. Why didn't they indemnify us? They didn't indemnify the directors and officers because Pan Pacific was obligated to defend the directors and officers. As I understood it, Pan Pacific, as the acquirer, entered into an agreement that it would indemnify in the event of a challenge to the acquisition. That is correct, Judge Gould. And so it honored that, and it paid the expenses of the defense. That's correct, Judge Gould. And that's important in this context because it's ---- Well, that doesn't answer my question. What does that have to do with anything? It has to do with this, Your Honor. Was Western not obligated to pay? Western, the key insuring clause, in order for there to be coverage ---- I asked a question. Western was not obligated to pay, Your Honor. The answer is yes, that is true. So if Pan Pacific had dropped off the face of the earth and gone bankrupt, suddenly been wiped out by a hurricane, flooded, Western would have been off the hook, would have said, sorry. No, Your Honor, that's not the situation. So it was obligated to pay. It was obligated to pay. It had somebody to fall back on, somebody else picked up the tab. But you understand that there was an obligation to pay and having a guarantor, for example. I mean, if you take a loan and you have a guarantor, the fact that the guarantor is on the hook and might, in fact, step in and pay the loan doesn't mean you're not obligated to pay. That's correct, Your Honor. You understand that concept, right? I understand that concept. Let me ask the question once again. Was Western obligated to pay? Western was not obligated. Western's obligation was removed by the indemnity in the agreement. So if Pan Pacific for some reason wasn't there, Western, if they'd been sued, could have gotten a dismissal, say, sorry, we don't have any liability because. In the event, in the way this policy works, in the event that Western. I'm talking about the policy. I'm talking about whether it was obligated to pay. Right, Your Honor. And you're telling me no, it was not, because. And I just want to make sure I understand your answer. It had no legal obligation. It could not be sued. If somebody sued it, it could have gotten a quick dismissal, not paying any fees for a malicious, for a frivolous claim. Your Honor, in the context of the. Yes or no? I mean, come on. I'm not trying to be difficult. I want to make sure I understand your question. Was Western, did Western have a legal obligation to pay? If Western's bylaws obligated them to indemnify the directors and officers, the answer would be yes. I don't know the answer to that question. But what I do know. Well, I'm sorry. If you don't know the answer, you don't know the answer. I'm asking you, the question I asked you, was Western obligated to pay? There are three possible answers you can give me. Yes, no, I don't know. Now, we can talk about, you can amplify those after you give me the answer, but I would like to know which of those three answers you choose. My answer at this point, Your Honor, is I do not know on the record. Okay. So insofar as you're relying on Western's not having an obligation to pay, it is entirely based on the fact that somebody else had an obligation to step in. It is, Your Honor. It is. So whatever obligation it had to pay or not have to pay on its bylaws or its contact with the directors or anything of that sort wasn't vitiated by that? No, Your Honor. Okay. So why don't you explain to me why the fact that there was somebody else who also has an obligation to pay does that so easily make it excluded from your policy? Absolutely, Your Honor. And I'd like to look at the policy itself, the wording of it. Absolutely. Give me a page number. Excerpt of record of 489, Your Honor. 489. I have a volume. It must be in the next volume. It must be in volume three. 489. Okay. And on that page, Your Honor, are the insuring clauses, the insuring agreements. Okay. It's always helpful to give a specific number, whatever. Yes. So under the heading one, insuring agreements, there are three insuring agreements. Well, four. Excuse me. You don't have to give me a road map. Just give me a number. Fair enough. If you look at insuring agreement B, which is the company reimbursement. B as in boy? Yes, Your Honor. Okay. One, the insurer will pay on behalf of the company loss for which the company has, to the extent permitted or required by law, indemnified the directors and officers, in which the directors and officers have become legally obligated to pay as a result of the claim. That is the section that's at issue in the defense cost side of this, because what has been asked of us is to pay the legal expenses that were incurred by the company. I understand that part. That seems to put you guys on the hook. But Western has not paid. It hasn't been indemnified. I didn't say. For which the company has, to the extent permitted or required by law, indemnified the directors and officers, in which the directors and officers have become legally obligated to pay as a result of the claim. That's correct, Your Honor. And the record is clear that Western never indemnified the directors and officers. As I understood the insurance policy, and maybe I'm missing something, it put an obligation on Twin Cities if Western made a payment and if Western was legally obligated to pay. So if Western made a gratuitous payment that it wasn't obligated to pay, no coverage. Or if it was obligated to pay but didn't make a payment, no coverage. The language seems to require literally that both be present. Is that the company's position? Yes. Thank you, Judge Gold. You said it better than I did. I don't know if I say it right or if I'm right or wrong. But that was my understanding of the position. Yes, it is, Your Honor. And it's clear that the Court has understood it. I would like to make sure I don't run out of time to address. And your point is that they were not obligated to pay or they did not, in fact, pay? They did not, in fact, pay. You don't dispute they were obligated to pay? At this point, I don't dispute that. Okay. Your Honor, with respect to the issue related to the bump up, I want to get down as quickly as I could to that because, as the appellant has said, they don't argue that restitutionary payments are uninsurable. And they don't argue that, at least at the start, what the plaintiffs sought was additional consideration for their shares. What they argue is that there was an order issued by the superior court in this case which narrowed the case and then somehow left the plaintiffs with nothing other than a non-restitutionary payment that was available. That is not fair. And I want to be clear as to why we believe that that is the case because this is important. The order, the underlying superior court's order, is at 797 of this record. That order does not address the remedy for the disclosures, the alleged breach of disclosures by the directors and officers and company, the defendants. And, in fact, the defendants in that case did not move on the issue of damages. It wasn't before the court. It had not been addressed. So let's look at the nondisclosure claims and what they were alleging. I believe that was a question you asked, Judge Kicinski. And if you look at the disclosure claims that are being alleged, it's at the excerpt of record 668 through 669. And those claims were based on allegations that the defendants failed to disclose as follows, that superior offers had been made to acquire Western. So where are you reading from? I'm reading from the complaint, paragraphs 82 and 83 in the underlying. I am on the page, but there are lines, you know, where there's a lot of words on the page. Thank you, Your Honor. If I start reading, tell me where you're starting to read from. A lot of paper up here. So we're under the heading first cause of action in paragraph 82. Page line. Excerpt of record 668. I got that. Thank you, Your Honor. Line. I'm looking now at starting at line 82. I'm sorry. There's only 25. Excuse me. Paragraph 82, line 14. Okay. That's the beginning of the paragraph. Go ahead. Yeah. Defendants had inner cider knowledge of nonpublic information regarding Western, that the Board of Trustees had a conflict of interest such that they would not independently exercise business judgment in voting in favor of the merger and in recommending a vote by shareholders in favor of the merger, that the exchange ratio in the stock for stock exchange merger was unfairly low, that the Board of Trustees had not negotiated the highest possible price for the shares of Western. The details of the compensation anticipated to be paid by the ---- You're taking on one right there. Had not negotiated the best possible price. It's just a sort of run-of-the-mill claim of lack of due diligence. It doesn't have anything to do with substitution or anything else. Well, it ---- I mean, it's focused on those words. I'm with you. And so those are the allegations. And the question, you're right, is then what does it mean? What's the remedy available to the plaintiffs? What are they complaining? Fine. Let's assume it's true. We didn't give you the information. How are you damaged? What happened? And so we should look at the record and see what the plaintiffs did after their claims were just limited to that. And specifically ---- Well, by the time you get the complaint, you don't know all of this stuff. What you know is you've been sued with all of these things. You need a lawyer. And that, you know, they're all over the place. They claim you are stupid. They claim you are lazy. They claim you are venal. I mean, that's how these complaints ---- you know, that you're on cahoots with other guys. They have all these claims. I mean, what you've read is your sort of typical run-of-the-mill complaint that's brought against officers and directors. And, you know, I don't know who will want to buy your client's product if, when they're going at stuff, you guys say, well, sorry, no coverage. I mean, you know, you probably have to take the premiums. But this, at least, part of what you've read ---- I mean, you picked the word that you read off the page. To me, it sounds like your regular, you know, you were lazy and stupid kind of claim against directors and officers. And there are people out there who make a living, a very nice living, I might say, in representing plaintiffs who circle these companies and extract judgments or settlements of these kinds of claims. You know, it's a business. I think a fair reading of this complaint, and not only this complaint, but all of the pleadings in the underlying allegation make clear ---- You picked the words to read. I did. I did. I'm asking you about the very words that you picked out of seven pages of record of spanning thousands of documents. You picked to read the words that talk about you didn't give us a high enough price. They didn't try hard enough to get a high price. You picked those words. Now talk to me about that. Defend why a claim that you didn't do a good enough job negotiating a price for these shares, the very words you picked out to read to me, why that is not exactly the kind of claim that you guys insured against. Because at the end of the day, what the plaintiffs have complained about is that they didn't get enough money for the shares that were exchanged in the merger. And by virtue of that fact, what the plaintiffs are seeking is to complete the transaction with more money for their shares. Why should it be, as a matter of public policy, that an insurance company that did not receive any benefits in the merger should subsidize the transaction? Pan Pacific is basically in a position where they acquired shares in the belief of plaintiffs. I have no idea what you're saying. I asked you a simple question. One of the claims in here is you didn't negotiate hard enough to get a good price for the shares. You read the words, right? There's a lot of other stuff in there. There's usually a lot of other stuff in there, because that's how these things are written. Why isn't that claim, if nothing else, you didn't fight hard enough for us? You were duped. Why isn't that the kind of claim that you guys, exactly the kind of thing that you guys insured against? Well, Your Honor, we might in a context where something other than restitutionary relief would be sought. But in this case, and I want to move on. You think the plaintiffs cared whether it was restitution or relief? They just want cash. That's right. They sue, and they get money. This is what they're out to get. They are not out to get a medal. They are not out to get the office of the director spanked or defamed. They want cash. But they have to prove. How is it ever, the cash comes from the company. I mean, let's say, in fact, it was nothing else but the claim, you guys were stupid and lazy and didn't fight hard enough for me. And then there was a settlement. Let's say that's all it is from the company. Covered or not covered? Nothing else in their complaint. We wouldn't be allowed to do discovery and discover what the underlying theories and damage theories were of the plaintiffs in that situation? In that situation, I think the best practice would be. Well, I'm sorry. You're not in the case at the time, presumably. So you are now, this is what happened. They brought this case. They claimed you guys were stupid and lazy. And you didn't, you were not diligent. You didn't get a high enough price for the shares. And in order to get rid of these people because to go forward with life and because it's much cheaper to, because people are scared of the expense of really defending a security transaction, they say give them a couple million dollars and let's get them out of our hair. Have you ever heard of that happening? Yes, Your Honor, of course I have. You have? Okay. I've heard of it, too. And so they say throw some money at them because trying to litigate this thing is going to be more expensive. And they say, insurance company, if you want to come in and defend us here for this, that's fine. You know, we'll be happy to defend all day long. But so long as we are having to pay for defense costs, we're going to settle the claim. And all they've claimed is stupidity and sloth. Covered or not covered? In that case, Your Honor, we'd want to be able to conduct an investigation and see whether or not it was covered, which we're entitled to do under the policy, by the way. And in that situation, we would conduct an investigation. You wouldn't be entitled to summary judgment, right, the way you got it here. I would, under this fact, be entitled to summary judgment, absolutely. And I want to get to this point because this is important. And the reason I was quoting those allegations is because those were the allegations that existed. And the question is, what did the plaintiffs say? You say they wanted cash. You're right, they wanted cash. What did they say they wanted cash for, and why did they say they wanted it? And we put in the record, and it's in the record, that after this order came down, the expert that was put up by the plaintiffs, by a fine, respected law firm, Keshet, Petrie, and Simon, put up an expert that said the reason these plaintiffs have been damaged is because they didn't get enough for their shares. The price was too low. And we believe they should have gotten more for their shares. And, therefore, on that basis, we want these defendants to subsidize the transaction and pay it. That is in the record. The declaration that is cited by Appellant's counsel. Well, I'm listening to your talk, but, I mean, let's say these guys really were stupid and lazy, and the price was too low because they didn't, they didn't, weren't diligent. So they say, well, you know, you got too low a price, and now we want you to pay for the fact that you didn't do everything that you should have done for us in negotiating a higher price. Where does this get you? I mean, that sounds exactly like this kind of thing that you guys insure. Well, no, Your Honor. We insure loss. And under California law, under the Level III decisions, we do not insure restitutionary payments. That is a matter of public policy. Judge Posner explained at length in the Level III decision why it is against public policy to insure. You know, if you don't want to insure anything involving a merger, why don't you just write in the policy and say, look, if it's damages arising from a merger acquisition or anything like that, we don't cover it. Put in a big exclusion and let the, let the, let the, let the, you know, it's too messy when I'm going to deal with it. But that's not what you have. You don't have an exclusion like that. No, you're right, Your Honor. And what I hear you saying is even if the claim is simply that they stumbled, that their directors and officers were, lacked diligence, it was, they didn't line their own pockets, they didn't, they didn't make a nickel on this transaction, they simply, the plaintiff claims they should have worked harder, they should have negotiated harder, they should have had a little bit of disclosure or something like that, they, essentially they stumbled, your view would be that is subsidizing the merger and you guys are not going to pay for it. That's what you're saying, right? You understand correctly, Your Honor. As I understand it, if I could clarify a point, it's the insurance companies and both of them are saying this, is if, even if there's a claim like for nondisclosure or negligence that might come within the policy's coverage, if the only damages for it are restitutionary, then they're not obligated under California law, it's not a loss. That is correct. Right? That is absolutely correct. I'm not saying I agree with that or not, but that's my understanding of the theory and that's the level three case theory. That is. My understanding is a little different. I mean, it is the same as Judge Gould and I think it goes a little bit beyond that. I think what you're saying is it is always restitutionary when a claim like that is made based on negligence or based on whatever. It's not only if the claim is restitutionary. In your view, it is always restitutionary. Well, you mentioned earlier in one of the earlier arguments not to use the word always and I would tend to fall in that camp because I would hate to do that. But I believe the analysis in level three where they say how a claim is worth it. Answer my question. The answer is. Virtually always, you know, almost always. I can't think of any exceptions right this minute as I'm standing here kind of always. I cannot think of an exception, Your Honor, that would apply. So if the directors and officers stumble, goof, out of stupidity, out of inattention, out of claimed stupidity or inattention, negligence, you know, whatever, whatever they pay for that lawsuit is, in your view, in the view of your colleagues over there, restitutionary and therefore barred by California law. Correct, Your Honor. Okay. Well, that's a position for sure. Yeah. Thank you, Your Honor. And I think it is supported by the cases that we've cited. I've far exceeded my five minutes of time and I'm happy to conclude here unless the Court. I think if you don't want to lose more ground, I think you better sit down. I respect that. Thank you, Judge. Anything further? I have no further questions. Okay. Thank you. Anything by way of rebuttal or anything like that? I pass, Your Honor. Okay. We will take a recess for a short time. Judge Kaczynski, thanks for the recess. Yeah. Thank you for the recess. Okay. We'll be back for the remaining case. All rise. The Court will stand at recess.
judges: Kozinski, Gould, Martinez